UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ASTA, L.L.C., | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 09 C 067 |
| v. | ) |
| | ) Magistrate Judge Cole |
| TELEZYGOLOGY, INC., | ) |
| | ) |
| Defendant. | ) |

### MEMORANDUM OPINION AND ORDER

The plaintiff, Asta, L.L.C., and the defendant, Telezygology, Inc., entered into a contract whereby Asta would provide sales personnel to Telezygology. The contract called for Telezygology to pay Asta 50% of the first year's base salary for any Astra salesperson it chose to hire. Telezygology hired two of the sales people, who were fired without having worked for a full year. Hence, it contended that it was only obligated to pay 50% of the amount actually payed, rather than 50% of the agreed upon annual salary. Asta sued for breach of contract, and now moves for judgment on the pleadings.

### I.
### BACKGROUND

Asta provides sales personnel on a contract basis to clients in a variety of industries, including high-tech companies. One such high-tech client was Telezygology, which makes and sells "intelligent fasteners": remote control locking, security, and monitoring systems. The two executed an "Independent Contractor Agreement" on June 12, 2008. Asta would provide sales people and train them on Telezygology's products, and Telezygology would pay Asta a retainer fee, expenses,

and commissions. (Complaint, ¶¶ 1-7; Answer, ¶¶ 1-7).[1] The kicker turned out be a provision in the "Fees" portion of the Agreement:

> Should [Telezygology] decide to hire any of the sales personnel that contractor [Aata] brings to [Telezygology], [Telezygology] shall pay [Asta] 50% of each hired sales person's first year base salary due on the date the sales people are hired by [Telezygology]. It is acknowledged that if [Telezygology] hires sales person from [Asta], any commission earned by sales person while employed by [Asta] will be paid by [Asta].

(Complaint, Ex. I, at 10; Complaint, ¶ 8; Answer, ¶ 8).

Obviously, an agreement to pay 50% of each hired person's first year base salary might appear a bit steep, for the first year's cost to the employer then becomes 150%. But that is what the parties agreed to, and, as sophisticated commercial parties, they were free to agree on any terms that were mutually acceptable, *City of New Orleans v. Warner*, 175 U.S. 120, 147 (1899); *FDIC v. Prince George Corp.*, 58 F.3d 1041, 1050 (4th Cir. 1995), even if the terms are "preposterous." *Beanstalk Group, Inc. v. AM General Corp.*, 283 F.3d 856 (7th Cir. 2002). Clauses similar to the one at issue in this case are not uncommon and have been approved by the Illinois Supreme Court. *See H & M Comm. Driver Leasing, Inc. v. Fox Valley Containers*, 209 Ill.2d 52, 805 N.E.2d 1177 (2004).[2]

---

[1] Many of the responses in Telezygology's answer deny Asta's factual assertions because they "contain[] legal conclusions to which no answer is required." (Answer, ¶¶ 3, 4, 6, 7, 8, 9, 10, 11). To be sure, some arguably do, such as whether Asta "fully performed all of its obligations," (Complaint, ¶ 11), but most do not. For example, paragraph 8 is simply a recitation of a provision from the parties' agreement. (Complaint, ¶ 8). This is a perplexing manner of pleading, especially since Telezygology admits that it executed the contract (Answer, ¶ 5), clearly concedes that the provision was a part of the parties' agreement throughout its brief, and the contract is attached to the Complaint. Moreover, if a legal conclusion required no answer as Telezygology asserts – it is wrong about this, *see* Fed.R.Civ.P. 8(b); *Neitzke v. Williams,* 490 U.S. 319, 325 (1989); *Jackson v. Marion County*, 66 F.3d 151, 153 (7th Cir. 1995); *State Farm Mut. Auto. Ins. Co. v. Riley*, 199 F.R.D. 276, 278 (N.D.Ill. 2001) – why does Telezygology deny it in the same breath? *See Cordero v. Central DuPage Hosp,.* 2006 WL 1765429, *1 (N.D.Ill. 2006)(striking "oxymoronic" responses).

[2] The plaintiff was in the business of leasing truck drivers and related personnel. It contracted with
(continued...)

Contracts like the one between Asta and Telezygology recognize that it is too costly for the customer to simply hire and train its own sales people and pay them an annual base salary – with whatever attendant benefits go along with their being employees. It is cheaper for the customer to have the contractors like Asta vet and train individuals in general sales techniques, and then further train them in the customer's specialized needs. Of course, if the customer is willing to foot the bill if he hires an Asta employee, the contractor gets what it bargained for. Without a clause like the one Asta and Telezygology agreed on, there would be no disincentive for a customer not to poach the contractor's employees. And, if the premium to be paid to Asta was measured by the duration of the poached employee's employment, rather than the annual base salary, the disincentive would be substantially diluted. That is, if the purloined employee did not work out, he could be fired in short order, and the premium to be paid to Asta would be small, thus justifying the risk of hiring the employee in the first instance. In any event, whether the provision is one-sided, or simply a kind of poison-pill to allow Asta to retain its valued personnel, Telezygology concedes that it agreed to the terms of the contract. (Answer, ¶ 5).

Asta sent Telezygology five sales people under the Agreement, and Telezygology paid the required retainer fees, expenses, and commissions. (Complaint, ¶¶ 9-10; Answer, ¶¶ 9-10). Come September 8, 2008, Telezygology hired two of these sales people, Mr. Kona and Ms. Tweten, at a base salary of $133,000, and $130,000 per annum, respectively. (Complaint, ¶ 12-13; Answer, ¶ 12-

---

[2](...continued)
the defendant to provide licensed drivers for whose services the defendant agreed to pay the plaintiff on an hourly basis. The contract provided that the defendant would not hire any driver whose employment with H & M terminated less than one year prior to being hired by the defendant. The contract went on to provide that if this provision were not complied with, the defendant would pay "$15,000 as liquidated damages" for each driver the defendant hired. 209 Ill.2d at 54-55.

13). But, neither of them worked for Telezygology for a year – they were terminated after about a month. (Answer, ¶ 13). So, not surprisingly, the dispute breaks down like this: Asta is demanding 50% of the $133,000 and $130,000 or $131,500, while Telezygology is saying they never actually made that much, so it shouldn't have to pay the full $131,150. Asta sued Telezygology for breach of contract. And because the case is simply all about the contract and its interpretation, Asta has filed a motion for judgment on the pleadings.

Telezygology argues that the clause simply doesn't mean what Asta says it does. It complains that such an interpretation would give Asta a windfall because Telezygology only kept the two employees on for a month. (Answer, Third Affirmative Defense). So for Telezygology, because Asta's interpretation of the provision is wrong, Asta has no breach of contract claim.

## II.
## ANALYSIS
### A.
### Motions for Judgment on the Pleadings

A court should grant a motion for judgment on the pleadings "[o]nly when it appears beyond a doubt that the [opponent] cannot prove any facts to support a claim for relief and the moving party demonstrates that there are no material issues of fact to be resolved . . . ." *Bannon v. University of Chicago*, 503 F.3d 623, 628 (7th Cir. 2007); *Moss v. Martin*, 473 F.3d 694, 698 (7th Cir. 2007). In assessing such a motion, a court must accept the facts alleged in the pleadings as true. *Radaszewski ex rel. Radaszewski v. Maram*, 383 F.3d 599, 600 (7th Cir. 2004).

The parties' dispute in the instant case is all about the *interpretation* of a single clause in their contract, which, of course, as an exhibit to the complaint is part of the pleadings for purposes of a motion for judgment on the pleadings under Rule 10(c), Federal Rules of Civil Procedure. *Northern*

4

*Indiana Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d 449, 452 (7th Cir. 1998). In fact, the Illinois Supreme Court's validation in *H & M Commercial Driving Leasing* of a clause like the one in dispute here came in the context of the trial court's entry of judgment on the pleadings. 209 Ill.2d at 52; 805 N.E.2d at 1177. It is important to note that no issue is raised by the defendant that the clause is invalid or unenforceable.[3] Hence, we need only be concerned with contract interpretation, which being a matter of law is generally amenable to resolution in the context of a judgment on the pleadings. *See Rickher v. Home Depot, Inc.*, 535 F.3d 661, 664 (7th Cir. 2008)("Under Illinois law, the interpretation of a contract presents a question of law that is decided by the court.").[4]

Indeed, the purpose of written contracts is to provide certainty and predictability and to eliminate the need for trials, which are "clumsy and costly...." *XCO Intern., Inc.*, 369 F.3d at 1001. *See Blue Cross and Blue Shield Assn. v. American Express Co.*, 467 F.3d 634, 640 (7th Cir. 2006)(parenthesis in original)("In the long run, everyone gains from predictability (and from rules that reduce the expense of litigating about such transactions)."); *In re Comdisco, Inc.*, 434 F.3d 963, 968 (7th Cir. 2006)("In general...issues of interpretation in contract cases should be resolved on the basis of the contract's language in order to minimize the costs and uncertainties of enforcing contracts. Only if the language is unclear is there any reason to burden the parties with a trial on the meaning of the contract."); *ConFold Pacific, Inc. v. Polaris Ind.*, 433 F.3d 952, 955 (7th Cir.

---

[3] For example, the defendant does not claim that the clause constitutes a penalty for non-performance and thus ought not be enforced. In addition to the issue not being presented, Judge Posner's panel opinion in *XCO Intern., Inc. v. Pacific Scientific Co.*, 369 F.3d 998, 1001-1003 (7th Cir. 2004) would make such an argument unlikely to succeed had it been made.

[4] The parties' agreement stated that it was governed by Illinois law. (Complaint, Ex. I, at 6).

2006)("Especially when dealing with a substantial contract between 'commercially sophisticated parties... who know how to say what they mean and have an incentive to draft their agreement carefully,'... there is great merit to the rule that the meaning of an unambiguous contract is a question of law rather than of fact... with the consequence 'that unambiguous contractual language must be enforced as it is written.'... The rule enables contract disputes to be resolved quickly and cheaply, 'protects the parties against the vagaries of the litigation process-a major reason for committing contracts to writing-without too great a risk of misinterpretation,' and by thus minimizing both contractual transaction costs and uncertainty increases the value of contracts as means of conducting business.")(Citations omitted); *In re Kmart Corp,* 434 F.3d 536, 541 (7th Cir. 2006)(the purpose of written contracts is "to produce certainty rather than set the stage for swearing contests.").

## B.

### Construing the Parties' Agreement

The objective in construing a contract is to give effect to the intent of the parties. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 714 (7th Cir. 2009); *Village of South Elgin v. Waste Management of Illinois, Inc.*, 348 Ill.App.3d 929, 941, 810 N.E.2d 658, 670 (2nd Dist. 2004). This does not mean a court somehow actually divines what the parties were thinking; after all, judges, after all cannot crawl into peoples' minds. They act on the basis of external signs. Posner, Overcoming Law, 276 (1995). Thus, a court must look to the parties' objective intent as manifested in their written agreement. *Hampton,* 561 F.3d at 714; *Vill. of S. Elgin,* 348 Ill.App.3d at 941, 810 N.E.2d at 670. This is how the court put it in *McElroy v. B.F. Goodrich Co.*, 73 F.3d 722, 727 (7th Cir. 1996)(Posner, C.J.):

When courts say that if contract language is clear the judge should look no further,

. . . they mean nothing more portentous than that the security that contracting parties seek when they commit their deal to writing requires a presumption that a written contract is to be interpreted without bringing in a jury to decide whose oral testimony about what the parties *really* intended is more credible. Only if the judge is stumped after making his best interpretive efforts and only if the oral or other "extrinsic" evidence that would be offered at trial would be likely to disambiguate the contract does the court convene a trial.[5]

It follows that contract interpretation starts with the language of the agreement, which must not be interpreted in a way contrary to the plain, obvious, and generally accepted meaning of its terms. *Hampton*, 561 F.3d at 714; *Krilich v. American Nat. Bank and Trust Co. of Chicago*, 334 Ill.App.3d 563, 575, 778 N.E.2d 1153, 1164 (2nd Dist. 2002). The dispute here revolves around what the Independent Contractor Agreement means by "first year base salary" when it says that Telezygology agrees to pay Asta "50% of each hired sales person's first year base salary." At first blush, it seems pretty clear. If Telezygology hires someone at a salary of $130,000 a year, or $133,000 a year, Telezygology has to pay Asta $65,000 or $66,500. But Telezygology says no, not unless that person actually remains employed at Telezygology for the full year. Otherwise, Asta just gets 50% of what the person made while in Telezygology's employ. (Answer, ¶ 13; Third Affirmative Defense). As it turns out, it remains pretty clear at subsequent blushes.

---

[5] The "objective theory" of contract interpretation, *Newkirk v. Village of Steger*, 536 F.3d 771, 774 (7th Cir. 2009); *Laserage Technology Corp. v. Laserage Laboratories, Inc.*, 972 F.2d 799, 802 (7th Cir.1992), traces its acceptance to, among others, Justice Holmes. Since at least *The Path of the Law*, 10 Harv.L.Rev. 457 (1897), it has been understood that the formation of a contract does not actually require the meeting of the minds of the parties in the sense a literal reading of the terms conveys. Today there is common agreement that "no one will understand the true theory of contract or be able to discuss some fundamental questions intelligently until he has understood that all contracts are formal, that the making of a contract depends not on the agreement of two minds in one intention, but on the agreement of two sets of external signs not on the parties having meant the same thing but on their having said the same thing." *Id.* at 464. *See Navair, Inc. v. IFR Americas, Inc.*, 519 F.3d 1131, 1139 (10th Cir.2008)("Put another way, the inquiry will focus not on the question of whether the subjective minds of the parties have met, but on whether their outward expression of assent is sufficient to form a contract."). *See also Goode v. Riley*, 153 Mass. 585, 586, 28 N.E. 228 (1891)(Holmes, J.).

# 1.

## The Phrase, "First Year Base Salary," Means The Amount Telezygology Agreed To Pay The Salesperson Per Year

The defendant's contention that it was only obligated to pay fifty percent of the amount actually paid by Asta to any salesperson who was hired in violation of the contract rests on a fundamental misconception of how language – be it statutory or contractual – is construed. The chief determinant of meaning of language is context. Scalia, A Matter of Interpretation: Federal Courts and the Law, 135 (1997). There is, as Cardozo said, a "transforming power of association for phrases as for men." *Marchant v. Mead-Morrison Mfg. Co.*, 252 N.Y. 284, 299 (1929). Thus, in order to properly understand the meaning of language there must be a discerning assessment of the context in which the words are used. *Cf. Williams v. Taylor*, 529 U.S. 420, 435 (2000). This is the familiar principle of *noscitur a sociis* – a principle applicable to contract as well as statutory construction. *Utility Audit, Inc. v. Horace Mann Service Corp.* 383 F.3d 683, 687 (7th Cir. 2004); *Baker v. America's Mortgage Servicing, Inc.*, 58 F.3d 321, 327 (7th Cir. 1995); Samuel Williston & Richard A. Lord, 11 Williston on Contacts §32:6 (4th ed. 1999). Hence, the meaning of any word "cannot be determined in isolation but must be drawn from the context in which it is used." *Textron Lycoming Reciprocating Engine Division v. United Automobile, Aerospace & Agricultural Implement Workers of American, Intern. Union*, 523 U.S. 653, 657 (1998). *See also Farmers Auto. Ins. Ass'n. v. St. Paul Mercury Ins. Co.*, 482 F.3d 976, 978 (7th Cir. 2007)("The contention is . . . unsound because of its neglect of context."); *Great West Casualty Co. v. Mayorga*, 342 F.3d 816, 818 (7th Cir.2003).

The defendant's restrictive reading of the clause at issue in this case is contrary to these

fundamental principles of interpretation. It focuses exclusively on the meaning of the word, "salary," while ignoring the words, "first year's base," as though those words had neither meaning nor purpose. Citing the website, http://dictionary.reference.com, Telezygology submits that salary simply means "a fixed compensation periodically paid to a person for regular work or services." (*Telezygology's Response in Opposition*, at 4-5). Black's Law Dictionary defines the term as "[a]n agreed compensation for services – especially professional or semiprofessional services – usually paid at regular intervals on a yearly basis, as distinguished from an hourly wage." Black's Law Dictionary, at 1364 (8th ed. 2004).

Telezygology's brief cites Black's as well, but omits the portion of the definition referring to a salary being paid on a yearly basis. Apart from the fact that "[s]trategic omissions do not" change the real meaning of clauses or phrases, *Swanson v. Bank of America, N.A.*, 563 F.3d 634, 636 (7th Cir. 2009), the concept of salary is commonly understood as meaning the amount of money a person is paid on an annual basis. People do not speak of what they earn in a month when asked what their annual salary is, and they do not respond with a calculation of what they may have earned to the date of the question. Yet, that is effectively how Telezygology reads the disputed clause in the contract with Asta. (*Telezygology's Response in Opposition*, at 5). This is a labored construction and one that is contrary to the commonly accepted meaning of the word, "salary."

The intent of contracting parties is not to be gathered from detached portions of a contract or from any clause of provision standing by itself. Still less is it to be divined by relying on a single word excised from the clause or phrase of which it is but a component part. The parties did not agree that the defendant would be obligated to pay 50% of the "salary" the defendant paid to a person who it hired from Asta. Had that been the phrasing, the defendant's argument might be persuasive. But,

9

the clause explicitly tied the amount Telezygology must pay Asta not to the person's salary but to the "first year base salary." And that basis for computation was not tied to how long the person actually was employed. So the parties clearly weren't talking about what the person might be paid at a shorter interval, or what the person actually took home before he was terminated or quit. They were talking about what Telezygology agreed to pay the person in their first year. Here, that was $133,000 for Mr. Kona, and $130,000 for Ms. Tweten. It would be a tortured reading to hold that "first year base salary" means what the two earned in the three weeks they worked for Telezygology.

This is enough to resolve the interpretation issue. But there is more. Telezygology's payment of the 50% of the first year's base salary was "due on the date the sales people were hired." Clearly, this could not mean that the parties agreed they would wait and see how long the hired sales people lasted and what they actually ended up making. Otherwise the amount due would not have been payable on the date of the hiring, but rather would be postponed to the date on which the employment ended. Alternatively, the parties would have agreed that if the sales person did not last a year, there would have to be a *pro rata* repayment by Asta. No such provisions exist, and their absence further demonstrates the untenability of the defendant's construction of the contract.

If the parties had meant that Telezygology would be obligated to pay 50% of whatever a hired salesperson made while working for Telezygology, they could easily have provided that in their agreement. *TAS Distributing Co., Inc. v. Cummins Engine Co., Inc.*, 491 F.3d 625, 637 (7th Cir. 2007). It is not for a court to rewrite a party's agreement, *United States v. Bethlehem Steel Corp.*, 315 U.S. 289, 311-312 (1942); *Hoosier Energy Rural Electric Coop, Inc. v. Amoco Tax Leasing IV Corp.*, 34 F.3d 1310, 1317 (7th Cir. 1994); *AES Technologies Systems, Inc. v. Coherent Radiation*, 583 F.2d 933, 941 (7th Cir. 1978), and there is a strong presumption against provisions that easily

could have been included in the contract but were not. *Cress v. Recreation Services*, 341 Ill.App.3d 149, 185, 795 N.E.2d 817, 851 (2nd Dist. 2003).

Finally, the disputed provision meets another test of contract interpretation: it makes perfect commercial sense. *See American Intern. Specialty Lines Ins. Co. v. Electronic Data Systems Corp.*, 347 F.3d 665, 670 (7th Cir. 2003); *Great West Casualty Co. v. Mayorga*, 342 F.3d 816, 818 (7th Cir.2003).[6] As the Illinois Supreme Court held in *H & M Commercial Driver Leasing*, an employer has a legitimate interest in maintaining professional personnel in its employ and without a clause requiring a premium payment in the event the other party chose to hire its personnel, the provider would become an involuntary and unpaid employment agency. 209 Ill.2d at 63. By requiring Telezygology to pay 50% of the hired employee's first year base salary contemporaneously with the hiring of the Astra employee, the contract accommodated Asta's legitimate interest in maintaining professional personnel in its employ, while at the same time gave Telezygology the right to hire such people so long as it was willing to pay the amount the parties had agreed upon. The fact that Telezygology was willing to agree to pay 50% of the first year's base salary of a person it hired from Asta "makes [it] a credible person to do business with, and thus promotes commerce." *XCO Intern., Inc.*, 369 F.3d 1101-1102.

The construction of the contract advanced by Telezygology does not make commercial sense, for it would allow Telezygology to hire Asta sales people with little risk since if they didn't work out, all that would be owed would be 50% of the actual time the person worked. That would hardly

---

[6] What Telezygology may have privately thought the clause meant is of no moment, because, objectively, it obviously means something else. *Skycom Corp. v. Telstar Corp.*, 813 F.2d 810, 814-15 (7th Cir.1987)(interpretation of a "contract depends on what the parties express to each other and to the world, not on what they keep to themselves.").

11

provide either an appropriate measure of liquidated damages – if that was the purpose of the 50% clause –or a sufficient disincentive not to hire Asta's people – if that was the clause's intent.[7]

## 2.

### The Disputed Provision Is Not Ambiguous

Telezygology's fallback position, which comes on the heels of its contention that the contract is unambiguous, is that the contract is ambiguous. (*Telezygology's Response in Opposition*, at 4-6). Under Illinois law, a contract is ambiguous if its terms may reasonably be interpreted in more than one way. *Krilich,* 778 N.E.2d at 1164. This doe not mean that a contract is rendered ambiguous simply because the parties disagree upon its proper construction. *Hampton*, 561 F.3d at 714; *Joyce v. DLA Piper Rudnick Gray Cary LLP*, 382 Ill.App.3d 632, 637, 888 N.E.2d 657, 662 (1st Dist. 2008). "Rather, an ambiguous contract is 'an agreement obscure in meaning, through indefiniteness of expression, or having a double meaning.'" *Hampton*, 561 F.3d at 714 (quoting *Whiting Stoker Co. v. Chcago Stoker Corp.*, 171 F.2d 248, 251 (7th Cir.1948). The provision at issue here suffers from neither shortcoming.

Telezygology also submits that the court should look at extrinsic evidence to determine whether the provision is ambiguous. (*Telezygology's Response in Opposition*, at 6). If that were the case, there would be no parole evidence rule, and extrinsic evidence would come in every time there was a dispute about the interpretation of a contract. Which is to say all the time. That's obviously

---

[7] At least on a literal level, the 50% payment is not for liquidated damages since the contract did not in terms prohibit the hiring of an Asta salesperson. Rather, it provided that if Telezygology "decide[d] to hire any of the sales personnel" provided by Asta, Telezygology would be required to pay Asta 50% of each hired salesperson's first year base salary due on the date the salesperson was hired. By contrast, the contract in *H & M Commercial Driver Leasing, Inc.* prohibited the hiring of personnel provided by the plaintiff to the defendant, and then set forth the amount the defendant would pay as "liquidated damages." *See* note 2, *supra.*

not the rule, *Hampton*, 561 F.3d at 714; *Joyce*, 382 Ill.App.3d at 637, 888 N.E.2d at 662, and the cases Telezygology relies upon do not support such a proposition.

In *William Blair and Co., LLC v. FI Liquidation Corp.*, 358 Ill.App. 3d 324, 339, 830 N.E.2d 760 (1st Dist 2005), the court allowed extrinsic evidence to show the meaning of the phrase "substantive discussions," but only because its meaning was unclear not only from dictionary definitions, but from the context of the parties' agreement as well. 358 Ill.App.3d at 336, 830 N.E.2d at 771. That's not the situation here and there is nothing in the disputed provision that would "stump" a judge and require evidence to figure out. *See McElroy*, 73 F.3d at 727. *Mathews v. Sears Pension Plan*, 144 F.3d 461 (7th Cir. 1998) dealt with the doctrine of extrinsic ambiguity, whereby "[i]n limited circumstances . . . , parties are allowed to present extrinsic evidence to demonstrate that although the contract looks clear, anyone who understood the context of its creation would understand that it doesn't mean what it seems to mean." 144 F.3d at 466. But it only applies in situations where the parties "couldn't have meant what they seem to have said . . . because of the context in which the contract had been intended to apply." *Pierce v. Atchison, Topeka and Santa Fe Ry. Co.*, 65 F.3d 562, 568 (7th Cir. 1995)(quotations omitted).

The context in which the contract here was made and the terms the parties employed preclude the conclusion that the parties meant something quite different than what they said. Here, as in *Pierce*, "there is no reason to believe that the parties did not assent to what the contract states." *Id.* The interpretation makes perfect sense in the context of their business relationship. Indeed, clauses like this are not uncommon between companies like Asta and Telezygology.

Moreover, Telezygology says that it could show the provision was extrinsically ambiguous by its own actions. (*Telezygology's Response in Opposition*, at 6). But such evidence would not be

allowed. In cases of extrinsic ambiguity, courts will only look to objective evidence from disinterested third parties, so subjective evidence, like whatever Telezygology thought or did, would not be admissible. *Commonwealth Ins. Co. v. Titan Tire Corp,*. 398 F.3d 879, 885 (7th Cir. 2004); *Pierce*, 65 F.3d at 568. That includes any evidence from its agents, employees, or executives. *Commonwealth Ins.*, 398 F.3d at 885.

### 3.

### There Was No Mutual Mistake

Finally, Telezygology says that "the Court may find that the parties attached materially different meanings to the phrase at issue, and that the contract should not be enforced due to the mutual mistake." (*Telezygology's Response in Opposition*, at 7). The contention is largely undeveloped and is not supported by legal authority. Consequently, it need not be considered. *de la Rama v. Illinois Dept. of Human Services*, 541 F.3d 681, 688 (7th Cir. 2008)(argument that was "conclusory and utterly lacking in any citation to the applicable law" was deemed waived); *United States. v. Hook*, 471 F.3d 766, 775 (7th Cir. 2006)("We repeatedly have made clear that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived (even where those arguments raise constitutional issues).")(citations omitted).

There was no mutual mistake here, however:

> The doctrine of mutual mistake is limited to cases in which both parties were reasonable in their inconsistent interpretations; cases, in other words, of irremediable ambiguity; more precisely, cases in which neither party is more at fault than the other. If neither party can be assigned the greater blame for the misunderstanding, there is no nonarbitrary basis for deciding which party's understanding to enforce, so either party is allowed to abandon the contract without liability. . . . But a party whose interpretation is a product of carelessness cannot obtain relief unless the other party was equally careless, for without an equality of blame there is no basis for shifting the loss by permitting rescission.

*Praxair, Inc. v. Hinshaw & Culbertson*, 235 F.3d 1028, 1034 (7th Cir. 2000). Here, Telezygology's interpretation is not reasonable, and there is no irremediable ambiguity.

## CONCLUSION

For the foregoing reasons, the plaintiff's motion for judgment on the pleadings [# 18] is GRANTED.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

DATE: 6/25/09